STATE OF NORTH CAROLINA v. DONALD JOHN SCANLON, Defendant

No. COA05-119

(Filed 7 March 2006)

**1. Homicide— first-degree murder—defendant present at victim's death—evidence sufficient**

There was sufficient evidence in a first-degree murder case for a jury to find beyond a reasonable doubt that defendant was present at the time of the victim's death.

**2. Homicide— first-degree murder—sufficiency of evidence— cause of death**

The State's evidence was sufficient to prove first-degree murder, and the trial court properly denied defendant's motion to dismiss, where the State's expert testified the cause of death was asphyxia (the victim was found with a plastic bag tied over her head) and that the manner of death was homicide, based on information from investigating officers about the scene. Neither the victim's past heart problems nor the traces of cocaine in her blood altered his opinion.

**3. Burglary and Unlawful Breaking or Entering— permission to enter victim's home—revoked**

The trial court did not err by not dismissing a felonious breaking and entering charge where defendant had had permission to enter the victim's home when he worked for her as a handyman, but had been evicted from the victim's home for stealing her credit cards and forging her checks.

**4. Larceny— evidence sufficient—possession of credit cards**

There was sufficient evidence for the trial court to deny defendant's motion to dismiss charges of felonious larceny and possession of a murder victim's credit cards.

**5. Larceny— sufficiency of evidence—inference that deceased victim did not consent to use of vehicle**

The trial court properly denied defendant's motion to dismiss charges of felonious larceny and possession of the victim's automobile where defendant admitted abandoning the victim's car in New Orleans and the jury could infer from the evidence that the victim did not consent to his use of the vehicle.

**6. Criminal Law— verdict—stealing credit cards—consistency with indictment**

There was no error where defendant contended the State failed to prove that he stole credit cards listed in the indictment but not specified in the verdict form or jury instructions. A verdict is deemed sufficient if it can be properly understood by reference to the indictment, evidence, and jury instructions, and a comparison of the indictment and jury instructions here reveals that they are consistent.

**7. Larceny; Possession of Stolen Property— credit cards—duplicative judgments**

The trial court erred by duplicating judgments for both larceny and possession of credit cards and an automobile. While a defendant may be charged with larceny, receiving, and possession of the same property, a defendant may be convicted for only one of those offenses.

**8. Homicide— first-degree murder—refusal to instruct on involuntary manslaughter**

There was no plain error in a first-degree murder prosecution in denying defendant's request to instruct the jurors on the lesser-included offense of involuntary manslaughter. A defendant is not entitled to have the jury consider a lesser offense when his sole defense is one of alibi; this defendant's sole and unequivocal defense was that he was not present at the time of death.

**9. Homicide— first-degree murder—failure to instruct on death by accident—no plain error**

There was no plain error in a first-degree murder prosecution where the court did not instruct the jury on death by accident. Although a defense expert testified that the victim died of sexual asphyxia, so that the judge should have instructed on accident, the outcome was not affected because defense counsel explained the accident theory in closing argument.

**10. Criminal Law— reinstruction—abbreviated statement of elements—no error in context**

There was no prejudicial error in a prosecution for first-degree murder where the jury asked for written copies of the elements of the offense, the court gave the jury a simplified element sheet for first-degree murder which excluded proximate causation, neither party objected when given the opportunity to do so,

and the court instructed the jury to put the simplified elements in the context of the charge. Assuming the instruction was improper, isolated erroneous portions of a charge will not alone afford grounds for reversal if the charge as a whole presents the law fairly and clearly.

**11. Criminal Law— instructions—conversations with jury**

The trial court did not err in a first-degree murder prosecution by not giving the jury written instructions about talking to witnesses or talking among themselves before deliberations. The court gave oral instructions; there is no requirement that they be in writing. N.C.G.S. § 15A-1236.

**12. Evidence— hearsay—victim's statements about defendant—residual exception—sufficiency of findings**

The trial court in a prosecution for first-degree murder made sufficient findings to support its admission of testimony by the victim's sister relating statements the victim made to her about defendant under the residual hearsay exception set forth in N.C.G.S. § 8C-1, Rule 804(b)(5). Although the trial court made insufficient findings for the admission of testimony by the sister about a statement made to the victim by a third party because the court made no findings as to the third party's unavailability and the reliability of her statement, the admission of such statement was not prejudicial error in light of the overwhelming evidence of defendant's guilt.

**13. Evidence— hearsay—victim's statement about defendant—residual exception—sufficiency of findings**

The trial court in a prosecution for first-degree murder made sufficient findings to support its admission of statements about defendant made by the victim to a probation officer and to law officers under the residual hearsay exception set forth in N.C.G.S. § 8C-1, Rule 804(b)(5).

**14. Evidence— hearsay—victim's statements admitted through testimony of others—state of mind exception**

The trial court did not err in a first-degree murder prosecution by admitting statements of the victim through other witnesses. They were admissible, at the least, to show state of mind.

**15. Criminal Law— prosecutor's closing argument—not too inflammatory**

A prosecutor's closing argument in a first-degree murder prosecution was not so inflammatory as to require the trial court to intervene ex mero motu where the prosecutor argued that defendant had attempted to sexually assault the victim's dead or dying body where evidence was presented that rape kit tests performed on the victim were negative for semen or recent sexual activity.

**16. Criminal Law— prosecution's argument—alleged misrepresentations of evidence—not prejudicial**

There was no prejudicial error in a first-degree murder prosecution as a result of the prosecutor's alleged misrepresentations of the significance of defendant's pubic hair found in the victim's bed.

**17. Criminal Law— prosecutor's argument—characterization of evidence and witnesses**

The bounds of permissible prosecutorial argument were not exceeded by an argument that the defense expert's testimony was "from another planet" and "actually cracks me up." Nor were the prosecutor's complimentary remarks about the State's witnesses, specifically the victim's family, so improper as to require ex mero motu intervention.

**18. Criminal Law— prosecutor's argument—entry into victim's house**

The prosecution in a first-degree murder prosecution properly argued its theory of a duplicate key used to gain entry of the victim's house where evidence was presented that there were no signs of forced entry and that defendant had entered the victim's house.

**19. Criminal Law— prosecutor's argument—tampering with evidence—response to defense argument**

The trial court did not abuse its discretion by not intervening ex mero motu in the prosecutor's closing arguments about tampering with the evidence. The State's argument was in response to a defense argument, defense counsel did not object or respond, and defendant failed to show prejudice.

**20. Criminal Law— motion to remove district attorney's office—removal of evidence—no misconduct**

The trial court in a first-degree murder prosecution did not abuse its discretion by denying defendant's motion to disqualify the district attorney's office as a result of the alleged removal of evidence from the police department property room and placement of the evidence in a locked closet in the prosecutor's office.

**21. Criminal Law— motion to suppress evidence for prosecutorial misconduct—denied**

The trial court did not err by denying a first-degree murder defendant's motion to suppress evidence based upon allegations of professional misconduct by prosecutors.

**22. Criminal Law— discussions with jury—mistrial denied**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion for a mistrial based on improper jury discussions where there was testimony of two jurors discussing the case outside the courtroom and some evidence that a juror was laughing and talking with a family member of the victim. The court found no substantial or irreparable prejudice to defendant's case.

**23. Criminal Law— motion for appropriate relief—prosecutor's misrepresentation of the evidence—defense failure to correct**

There was no error in denying a first-degree murder defendant's motion for appropriate relief based on the State's misrepresentation of the evidence and minimization of the life-threatening nature of the victim's medical condition. Defense counsel testified that he had access to the same evidence as the prosecution, but failed to use the information to correct the alleged misrepresentations made by prosecuting witnesses and by the prosecutor.

**24. Criminal Law— false evidence—not intentionally misleading—new trial denied**

There was no error in denying a first-degree murder defendant's motion for a new trial based on a family member's alleged misrepresentation of the victim's disability status. There was competent evidence to support the trial court's finding that the testimony was not intentionally misleading.

**25. Constitutional Law— effective assistance of counsel—defense strategy**

The trial court did not err by denying a first-degree murder defendant's motion for a new trial based on ineffective assistance of counsel. Trial counsel's decision to pursue a particular defense strategy cannot be second-guessed on appeal.

Appeal by Defendant from judgment and order entered 9 June 1998, and 25 February 2004, respectively, by Judge Ronald L. Stephens in Superior Court, Durham County. Heard in the Court of Appeals 15 November 2005.

*Attorney General Roy Cooper, by Special Deputy Attorney General Barry McNeill, for the State.*

*Staples Hughes, Appellate Defender, and Janet Moore, Assistant Appellate Defender, for the defendant-appellant.*

WYNN, Judge.

This appeal arises from Defendant Donald John Scanlon's convictions of first-degree murder, felonious breaking and entering, and felonious larceny and possession. In his appeal, Defendant presents multiple issues challenging the fairness of his trial. After carefully reviewing his appeal, we conclude that Defendant received a trial free of prejudicial error, except that we vacate Defendant's felonious possession charges as being duplicitous with his convictions for felonious larceny.

The facts pertinent to this appeal indicate that: Defendant worked for Claudine Wilson Harris as a handyman from October 1995 through January 1996. Defendant lived at Ms. Harris' residence until she discovered that he had been misusing her credit cards and forging checks on her checking account. After Ms. Harris evicted Defendant from her home and sought to take out warrants against him, Defendant threatened to kill her. Ms. Harris told her sister, Barbara Breeden, that she feared that Defendant had a key to her home and she felt that she should have the locks changed. Ms. Harris never changed the locks to her residence; however, as a result of her fears for her own safety, Ms. Harris' nephew, Carlos Breeden, and his girlfriend came to live with her at the end of January 1996.

At around 9:00 p.m. on 27 February 1996, Carlos Breeden found Ms. Harris' body in her bed with a plastic bag wrapped around her

STATE v. SCANLON

[176 N.C. App. 410 (2006)]

head and tied in a knot. Ms. Harris' sweatshirt was pushed up, revealing her underclothes, and her sweat pants and under pants were partially pulled down. Near her bed was a soup can punched with holes, described as a pipe for smoking controlled substances, and a torn-up letter to Defendant expressing her feelings for him. A toxicology report revealed that she had cocaine metabolites in her blood.

On 10 March 1996, authorities arrested Defendant in Syracuse, New York (on unrelated charges) and found in his possession several of Ms. Harris' credit cards, as well as a blank check from Ms. Harris' business checking account. The arresting officers also seized pieces of paper containing Ms. Harris' address, date of birth, social security number, and her First Union checking account number. Meanwhile, in New Orleans, where Defendant admittedly abandoned Ms. Harris' car a few days before, police officers found three keys in the car, none of which fit the lock to Ms. Harris' home.

On 18 March 1996, a Durham County Grand Jury returned true bills of indictment charging Defendant with the first-degree murder of Ms. Harris, felonious breaking and entering of her residence, and felonious larceny and possession of certain credit cards and an automobile belonging to her. Defendant was tried at the 7 May 1998 Criminal Session of Superior Court, Durham County before Judge Ronald L. Stephens.

At trial, Dr. Robert Thompson, the forensic pathologist who supervised the autopsy of Ms. Harris, testified that the cause of her death was asphyxiation. Dr. Thompson further testified that the manner of Ms. Harris' death was homicide based upon information he received from investigating police officers, including that she was found in her bed at home with a plastic bag wrapped and tied around her head; sheets and blankets were piled on top of her body on the bed; certain items in her house had been disturbed; and, her car had been stolen.

Dr. Lawrence Harris, the defense forensic pathologist, testified that Ms. Harris died of a cocaine-induced coronary blockage during attempted sexual asphyxiation. He based this opinion on the plastic bag, cocaine metabolites, "new clots" blocking the bypass artery in Ms. Harris' heart, her disarranged clothing, and the round bed where her body was discovered. On cross-examination, Dr. Harris admitted that he never reviewed Ms. Harris' medical records or spoke to her doctor prior to testifying. He also testified on cross-examination regarding evidence showing that Ms. Harris was found underneath

a "mountain of covers" with a plastic bag wrapped and tied in a knot around her head that "[s]omeone else did that. I don't believe she did that."

The State further presented evidence to show that Defendant's DNA was found on a cigarette butt in one of the rooms upstairs, near Ms. Harris' bedroom. Carlos Breeden testified that the cigarette butt was not present on 25 February 1996, the day before the State contends Ms. Harris was murdered. The State presented other forensic evidence, including head hair microscopically consistent with Defendant's found on the bed comforter and pillow case on the bed where Ms. Harris' body was discovered, and one of Defendant's pubic hairs on a bed cover near Ms. Harris' body.

On 3 June 1998, the jury returned verdicts finding Defendant guilty on all charges. At the sentencing phase, the jury returned its recommendation that Defendant be sentenced to death, and Judge Stephens entered the judgment accordingly. Defendant gave notice of appeal in open court, and the Office of the Appellate Defender was appointed to represent Defendant on the direct appeal to the Supreme Court of North Carolina.

On 5 May 2000, Defendant filed a Motion for Appropriate Relief in the Supreme Court, arguing that the prosecutors at trial made numerous misrepresentations that minimized the severity of Ms. Harris' medical condition, despite her medical records showing a history of complaints and treatment for anxiety and depression before her death. In addition, Defendant alleged that the medical records showed Ms. Harris' heart condition was complicated by a number of apparent risk factors, such as smoking, hypertension, and a family history of heart disease; that Ms. Harris sought emergency treatment for chest pain or labored breathing on several occasions in the months before her death; and that Ms. Harris had one emergency hospitalization just "weeks before her death." As a second independent claim for relief, Defendant alleged that he received ineffective assistance of counsel from his trial attorneys because his counsel had access to Ms. Harris' medical records before trial, but neither presented the records to any medical expert for review, nor corrected the prosecutors' alleged misrepresentations about Ms. Harris' medical conditions, nor "brought the truth to the attention of either the Medical Examiner or Defendant's capital jury."

On 15 June 2000, the Supreme Court entered an order remanding Defendant's Motion for Appropriate Relief to Superior Court, Durham

County for an evidentiary hearing. *State v. Scanlon*, 352 N.C. 155, 544 S.E.2d 241 (2000). The order further directed the trial judge at the evidentiary hearing to make findings of fact and conclusions of law, and to transmit the resulting order to the Supreme Court so that Court could "proceed with the appeal or enter an order terminating the appeal."

At the evidentiary hearing in October and November 2002, the trial court heard testimony from several expert witnesses regarding the severity of Ms. Harris' heart condition at the time of her death and expert testimony on the likelihood that the manner of Ms. Harris' death was suicide, accident or homicide. Brian Aus and David Castle, the attorneys that represented Defendant during the guilt/innocence and sentencing phases of his criminal proceedings, also testified about the defense strategy utilized in representing Defendant.

On 25 February 2004, Judge Stephens filed a Memorandum Opinion and Order making findings of fact and conclusions of law granting Defendant a new capital sentencing proceeding due to ineffective assistance of counsel at the sentencing phase of his trial, but denying Defendant relief as to the guilt/innocence phase of his trial. Subsequently, Defendant filed a Renewed Request for Reversal of Judgments and Dismissal of Charges or New Trial and Alternative Motion for Amendment of Appellate Record, Expedite Briefing and New Oral Argument in the Supreme Court. The Supreme Court denied Defendant's motions for dismissal of charges and for a new trial, *State v. Scanlon*, 358 N.C. 549, 600 S.E.2d 463 (2004), and also denied Defendant's motion for expedited rebriefing and new oral argument "without prejudice to refile in the appellate court division after resentencing." *State v. Scanlon*, —— N.C. ——, 600 S.E.2d 463 (2004).

On 23 August 2004, the State elected not to seek the death penalty against Defendant pursuant to its discretion under section 15A-2004(d) of the North Carolina General Statutes, and the trial court resentenced Defendant to life imprisonment without parole. Defendant appeals the judgments for first-degree murder, felonious breaking and entering, and felonious larceny and possession. Defendant also appeals the trial court's order denying him a new trial due to prosecutorial misconduct and ineffective assistance of counsel.

**[1]** In his first argument on appeal, Defendant contends the trial court erred in denying his motion to dismiss the first-degree murder charge because there was insufficient evidence to prove beyond a

reasonable doubt he was (1) present when Ms. Harris died, (2) responsible for her death, and (3) committed premeditated, deliberate murder. Defendant's argument is without merit.

The test for sufficiency of the evidence in a criminal case is whether there is substantial evidence of all elements of the offense charged that would allow any rational trier of fact to find beyond a reasonable doubt that the defendant committed the offense. *State v. Richardson*, 342 N.C. 772, 785, 467 S.E.2d 685, 692 (1996). Substantial evidence is that relevant evidence which a reasonable mind would accept as sufficient to support a conclusion. *State v. Patterson*, 335 N.C. 437, 449, 439 S.E.2d 578, 585 (1994) (citation omitted). The evidence "must be viewed in a light most favorable to the State, and the State is to receive any reasonable inference that can be drawn from the evidence." *Id.*

To convict a defendant of first-degree murder, the State must prove the following elements (1) the unlawful killing of another human being; (2) with malice; and (3) with premeditation and deliberation. *State v. Haynesworth*, 146 N.C. App. 523, 527, 553 S.E.2d 103, 107 (2001).

Defendant argues the State failed to prove beyond a reasonable doubt that Ms. Harris died in the narrow time frame when Defendant could have been present. The record shows that Ms. Breeden testified that she last spoke with her sister at 1:00 p.m. on 26 February 1996. The State also submitted a receipt at trial, revealing that Defendant used Ms. Harris' Exxon credit card at 3:33 p.m. on 26 February 1996, at a gas station near her home. Thereafter, the evidence shows that Defendant traveled throughout the Southeast in Ms. Harris' car, using various credit cards belonging to her. This evidence tends to support the State's theory that Defendant had the opportunity to murder Ms. Harris some time in the afternoon of 26 February 1996.

Although the State's expert testified that Ms. Harris died "twelve to twenty-four hours" from the time of the autopsy performed on Wednesday, 28 February 1996, at 10:00 a.m., he later testified that Ms. Harris could have died on the early afternoon of 26 February 1996, when Defendant was present in Durham. Dr. Harris, Defendant's expert, also testified on cross-examination that "[g]iven that it was February, and I understand that the window was open, she was under bed clothes . . . I think she was dead from [26 February 1996]."

Moreover, the State presented evidence of Defendant's DNA on a cigarette butt in Ms. Harris' house, which Carlos Breeden testified

was not present in the house on Sunday, the day before the State contends Defendant murdered Ms. Harris. Defendant also pawned a gold ring similar to a ring belonging to Carlos at a Durham pawn shop at 4:12 p.m. on 26 February 1996. Finally, the State presented evidence to show that Defendant admitted that he abandoned Ms. Harris' car in New Orleans and, when he was arrested in Syracuse, he possessed of several of her credit cards. Based on this evidence, we conclude that the State presented sufficient evidence to allow a jury to find beyond a reasonable doubt that Defendant was present at the time of Ms. Harris' death.

[2] Defendant next challenges the sufficiency of the State's evidence to prove homicide, and that Defendant committed premeditated, deliberate murder. The record reveals that the State's expert, Dr. Thompson, testified that the cause of Ms. Harris' death was asphyxia and that the manner of death was homicide. Dr. Thompson based his opinion as to the manner of death on information provided by investigating police officers tending to show that Ms. Harris was found in bed at her home with a plastic bag wrapped around her head and tied around the neck, covered up by bed clothes; and that the house was locked, but things had been disturbed inside the house and her car was stolen. Ms. Harris' past coronary by-pass and heart problems did not change Dr. Thompson's opinion of the cause of death as asphyxia, nor did the traces of cocaine metabolites in Ms. Harris' blood.

As it relates to evidence presented at trial that Defendant committed the murder with a specific intent to kill formed after premeditation and deliberation, Ms. Breeden testified that Ms. Harris told her that Defendant said he was going to kill her "if she didn't stop blaming him for stealing the money and her credit cards." Viewing this evidence in the light most favorable to the State, we conclude the trial court properly denied Defendant's motion to dismiss the first-degree murder charge. Accordingly, Defendant's assignment of error is without merit.

[3] Defendant next argues the trial court erroneously denied his motion to dismiss the felonious breaking and entering and the felonious larceny and possession charges.

To prove a defendant guilty of felonious breaking and entering, the State must present evidence to prove the defendant (1) breaks or enters; (2) without consent of the owner; (3) a building; (4) with the intent to commit larceny therein. N.C. Gen. Stat. § 14-54(a) (2005); *State v. Boone*, 297 N.C. 652, 655, 256 S.E.2d 683, 685 (1979).

Defendant contends the State failed to prove that Ms. Harris did not give consent to him entering her home. Although Ms. Harris gave Defendant permission to enter her home on previous occasions, Ms. Breeden testified that Ms. Harris had evicted Defendant from her home some time in January 1996, because he had been stealing her credit cards and forging her checks. Moreover, the State presented evidence to show that Ms. Harris had complained to police about Defendant's unauthorized use of her credit cards. We hold that a reasonable juror could infer from the evidence showing that Ms. Harris evicted Defendant from her home, and reported that Defendant was forging checks and stealing her credit cards, that she did not consent to him entering her home or to the use of her credit cards on 26 February 1996. Thus, when the evidence is viewed in the light most favorable to the State, we conclude that the trial court did not err in denying Defendant's motion to dismiss the felonious breaking and entering charge.

[4] We also reject Defendant's argument that the trial court erred in denying his motion to dismiss the felonious larceny and possession charges. To prove larceny and possession, the State must prove the defendant (1) took personal property belonging to another; (2) and carried it away; (3) without the consent of the possessor; (4) with the intent to deprive the possessor of its use permanently; and (5) knowing that the taker was not entitled to it. N.C. Gen. Stat. § 14-72 (2005). In addition, for the larceny and possession of the credit card to be classified as a felony, the State must prove the defendant committed the larceny pursuant to a breaking or entering of a building. N.C. Gen. Stat. § 14-72(b)(2). To classify the larceny and possession of the automobile as a felony, the State must prove the value of the automobile was greater than $1,000.00. N.C. Gen. Stat. § 14-72(a).

In this case, when Defendant was arrested in Syracuse after leaving a trail of forged credit card receipts signed "C.W. Harris" throughout the Southeast, Defendant was found in possession of Ms. Harris' Visa, Sears, Exxon, and Best credit cards. At trial, the State presented evidence to show that Ms. Harris had complained to police about the forged checks by Defendant and his unauthorized use of her credit cards, stating that her credit cards would disappear overnight and then reappear the next day. There is no evidence in the record that Defendant had been authorized to use any credit card other than Ms. Harris' Lowe's or Home Depot credit cards. In viewing this evidence in the light most favorable to the State, we hold there was sufficient evidence for the trial court to deny Defendant's motion

to dismiss the charges of felonious larceny and possession of Ms. Harris' credit cards.

**[5]** As it relates to the felonious larceny and possession of Ms. Harris' automobile, we again find there was sufficient evidence in the record for the State to withstand Defendant's motion to dismiss. Defendant admittedly abandoned Ms. Harris' car in New Orleans. A jury could infer from the testimony regarding Ms. Harris' evicting Defendant, reporting him for forging her checks and reporting him for using her credit cards, that she did not consent to him using her vehicle on 26 February 1996. Thus, when the evidence is viewed in the light most favorable to the State, the trial court properly denied Defendant's motion to dismiss the felonious larceny and possession of automobile charges. We, therefore, reject Defendant's assignments of error.

**[6]** Defendant also contends the State failed to prove that he stole the specific credit cards listed in the indictment, but not specified in the verdict form or jury instructions. However, our "statutes do not specify what constitutes a proper verdict sheet[,] . . . [n]or have our Courts required the verdict forms to match the specificity expected of the indictment." *State v. Floyd*, 148 N.C. App. 290, 295, 558 S.E.2d 237, 240-41 (2002). A verdict is deemed sufficient if it "can be properly understood by reference to the indictment, evidence and jury instructions." *State v. Connard*, 81 N.C. App. 327, 336, 344 S.E.2d 568, 574 (1986), *aff'd*, 319 N.C. 392-93, 354 S.E.2d 238-39 (1987) (per curiam). With regard to the challenged jury instructions, a comparison of the indictment and the jury instructions on the larceny and possession of the credit cards reveals that they are consistent. *See State v. Kornegay*, 313 N.C. 1, 32, 326 S.E.2d 881, 903 (1985) (holding there is no fatal variance between the indictment and jury instructions where a comparison between the language of the indictment and the jury instructions on the charges reveals they are entirely consistent). Thus, Defendant's assignment of error is without merit.

**[7]** Defendant next contends the trial court erred by duplicating judgments on larceny and possession for the credit cards and the automobile. We agree, and note that the State failed to address this argument in its brief which leads us to conclude that the State acknowledges that the law in North Carolina supports Defendant's contention on this issue.

While a defendant may be charged with larceny, receiving, and possession of the same property, a defendant may only be convicted

for only one of those offenses. *State v. Perry*, 305 N.C. 225, 236-37, 287 S.E.2d 810, 817 (1982). In *Perry*, our Supreme Court stated:

> The prosecutor may of course go to trial against a single defendant on charges of larceny, receiving, and possession of the same property. However, having determined that the crimes of larceny, receiving, and possession of stolen property are separate and distinct offenses, but having concluded that the Legislature did not intend to punish an individual for receiving or possession of the same goods that he stole, we hold that, though a defendant may be indicted and tried on charges of larceny, receiving, and possession of the same property, he may be convicted of only one of those offenses.

*Id.*

In the case *sub judice*, the jury found Defendant guilty of felonious larceny and possession of Ms. Harris' automobile and credit cards. Under *Perry*, while Defendant could be indicted and tried on both charges, he can be convicted only on one charge to avoid double jeopardy. *See id.* Because Defendant was convicted on both charges, we vacate Defendant's additional convictions for possession of the automobile and the credit cards. *See State v. Andrews*, 306 N.C. 144, 148, 291 S.E.2d 581, 584 (1982).

[8] In his next assignment of error, Defendant contends the trial court committed plain error in denying his request to instruct the jurors on the lesser-included offense of involuntary manslaughter. Defendant argues that the jury may have concluded that he was, indeed, present at the time of Ms. Harris' death, but that there was no premeditation or deliberation or malice aforethought. Defendant's argument is without merit.

A defendant is not entitled to have the jury consider a lesser offense when his sole defense is one of alibi. *State v. Corbett*, 339 N.C. 313, 335, 451 S.E.2d 252, 264 (1994). Indeed, our Supreme Court has held:

> where a defendant's sole defense is one of alibi, he is not entitled to have the jury consider a lesser offense on the theory that jurors may take bits and pieces of the State's evidence and bits and pieces of defendant's evidence and thus find him guilty of a lesser offense not positively supported by the evidence.

*Id.* Here, Defendant's sole and unequivocal defense was that he was not present at the time of death. Because Defendant's only defense to

the murder charge was that he was not present at the time of Ms. Harris' death, the trial court did not err in failing to submit an involuntary manslaughter instruction to the jury.

**[9]** Defendant next contends the trial court committed plain error by failing to instruct the jury concerning death by accident as it relates to the first-degree murder charges.

It is the duty of the trial court to instruct the jury on all of the substantive features of a case notwithstanding the absence of a request by one of the parties for a particular instruction. *State v. Loftin*, 322 N.C. 375, 381, 368 S.E.2d 613, 617 (1988). Our Supreme Court has held, "[a]ll defenses arising from the evidence presented during the trial constitute substantive features of a case and therefore warrant the trial court's instruction thereon." *Id.* (citations omitted).

In this case, Dr. Harris, an expert for the defense, testified that Ms. Harris died of a heart attack in association with cocaine use and oxygen deprivation. Dr. Harris' "sexual asphyxia" theory of the case was such as to warrant the defense of accident, a substantive feature arising upon the evidence presented. Accordingly, even in the absence of a specific request therefore, the trial judge was duty bound under our case law to instruct the jury on the accident defense. However, we must further determine whether the trial court's error rises to the level of plain error.

"[T]o reach the level of 'plain error' . . ., the error in the trial court's jury instructions must be 'so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached.' " *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993) (quoting *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988)). Here, the trial judge's omission of the instruction on death by accident does not rise to the level of plain error. Defendant's counsel explained the accident theory in his closing argument to the jury, noting that the defense did not have to prove that Ms. Harris' death was an accident. Thus, even if the trial judge had given the admittedly called-for instruction on death by accident, we conclude that the presence of the death by accident instruction would not have affected the outcome. Accordingly, Defendant's assignment of error is without merit.

**[10]** Defendant next contends the trial court erroneously reinstructed the jury on the elements of first-degree murder by providing to the jury an inaccurate four-point list.

STATE v. SCANLON

[176 N.C. App. 410 (2006)]

Preliminarily, we note that Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure states that "[a] party may not assign as error any portion of the jury charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict[.]" N.C. R. App. P. 10(b)(2). Because Defendant concedes that he did not object to the trial court's instructions, our review of Defendant's contention is limited to plain error. *See* N.C. R. App. P. 10(c)(4).

A review of the record reveals that after the trial judge verbally instructed the jury on each element of the first-degree murder charge, the jury requested written copies of the provable elements of each of the charges against Defendant. The Court asked whether either party had any objections to giving the jury a simplified form of the elements without any explanation. Neither party objected. The trial court told the jury that he would grant their request for a simplified form, but emphasized, ". . . I will remind you now, you will need to put [the simplified elements] in the context of the charge that I gave you, too, because I'm not going to go through in what I give you and expand upon what each of those things, in fact, meant."

The following morning, the trial judge provided the jury with a simplified element sheet for first-degree murder which provided:

FIRST DEGREE MURDER

Elements:

    (1) an unlawful killing (with a deadly weapon)

    (2) Of another living human being

    (3) with Malice

    (4) And with a specific intent to kill formed after premeditation and deliberation.

Defendant contends that this list, which was the last word guiding the jury's deliberations, eliminated the element of proximate causation; collapsed the separate elements of intent, premeditation, and deliberation; and, therefore, reduced the State's burden of proof. Defendant's contention is without merit.

Although the element sheet for first-degree murder excludes proximate causation, we do not interpret this instruction as reducing the State's burden of proof. The trial court previously explained these elements correctly to the jury and offered to further instruct the jury if they had questions about the required proof for the charges against

Defendant. Indeed, our Supreme Court has held, "[i]f the [jury] charge as a whole presents the law fairly and clearly to the jury, the fact that isolated expressions, standing alone, might be considered erroneous will afford no ground for a reversal." *State v. Chandler*, 342 N.C. 742, 751-52, 467 S.E.2d 636, 641 (1996) (citation omitted). Even assuming *arguendo* that portions of these instructions were improper, we cannot conclude that a reasonable probability exists that the jury would have reached a different result. Thus, Defendant's assignment of error is rejected.

**[11]** Defendant next contends the trial court erroneously failed to give written cautionary instructions to the jury under North Carolina General Statute section 15A-1236. We disagree.

Section 15A-1236 mandates cautionary instructions to jurors about talking to witnesses or discussing the case among themselves until deliberations begin. N.C. Gen. Stat. § 15A-1236 (2005). Here, the trial judge verbally gave cautionary instructions to each individual juror, and, at other times during jury selection, the trial judge gave cautionary verbal instructions to the *venire*. Because Defendant cites to no proposition of law to support his assertion that the trial court must give *written* instructions to the jury, and our independent research reveals no such requirement, Defendant's assignment of error is overruled.

**[12]** Defendant next argues that the trial court erred by overruling his objections to inadmissible hearsay testimony given by several State witnesses under N.C. R. Evid. 804(b)(5).[1]

Rule 804(b)(5) of the North Carolina Rules of Evidence allows the introduction of a hearsay statement where, even though the statement is not covered by a specific exception, the statement's declarant is unavailable and the statement possesses "circumstantial guarantees of trustworthiness" equivalent to other hearsay exceptions. *See* N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) (2005). To allow the admission of a hearsay statement under this "residual" exception, the trial court must find that the declarant is unavailable. *State v. Triplett*, 316 N.C. 1, 8, 340 S.E.2d 736, 740 (1986). Thereafter, the trial court must determine:

---

1. We note that the hearsay statements Defendant contends were erroneously admitted into evidence at trial are non-testimonial. Thus, we need not address any *Crawford* implications in our analysis of these hearsay statements. *See Crawford v. Washington*, 541 U.S. 36, 68, 158 L. Ed. 2d 177, 203 (2004) ("[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law[.]").

(1) Whether the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars;

(2) That the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4);

(3) That the statement possesses 'equivalent circumstantial guarantees of trustworthiness';

(4) That the proffered statement is offered as evidence of a material fact;

(5) Whether the hearsay is 'more probative on the point for which it is offered than any other evidence which the proponent can produce through reasonable means'; and

(6) Whether 'the general purposes of [the] rules [of evidence] and the interests of justice will best be served by admission of the statement into evidence.'

*State v. Ali*, 329 N.C. 394, 408, 407 S.E.2d 183, 191-92 (1991) (quoting *Triplett*, 316 N.C. at 9, 340 S.E.2d at 741) (alterations in original). To determine whether a hearsay statement possesses the requisite "equivalent circumstantial guarantees of trustworthiness," the trial court considers:

(1) the declarant's personal knowledge of the underlying event; (2) the declarant's motivation to speak the truth; (3) whether the declarant recanted; and (4) the reason, within the meaning of Rule 804(a), for the declarant's unavailability.

*State v. Nichols*, 321 N.C. 616, 624, 365 S.E.2d 561, 566 (1988) (citation omitted). "The trial court should make findings of fact and conclusions of law when determining if an out-of-court hearsay statement possesses the necessary circumstantial guarantee of trustworthiness to allow its admission." *State v. Swindler*, 339 N.C. 469, 474, 450 S.E.2d 907, 910-11 (1994) (citation omitted).

In this case, Defendant contends that the trial court erred in allowing Ms. Breeden to testify about conversations she had with her sister about Defendant, including that he was living at a homeless shelter; stealing and forging her checks; causing her checks to bounce; and fraudulently using her credit card. Defendant further argues that Ms. Breeden's testimony that Ms. Harris had taken warrants out against him should have been excluded as in-

admissible hearsay, as well as, Ms. Breeden's statement that Ms. Harris told her that Kim Senter said Defendant made a duplicate key to her house.

The record reveals that before Ms. Breeden's testimony about conversations she had with Ms. Harris, the State gave the Court notice pursuant to N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) and under *Triplett*. The trial court noted that it had reviewed the notices and, as opposed to recalling Ms. Breeden to the stand on *voir dire*, it allowed the State to proffer the notices as the substance of what Ms. Breeden's expected testimony would be. Defendant objected on grounds that there were no dates, times, or circumstances in which the statements were made, and also because there was no indication that Ms. Harris had personal knowledge of the facts in the statements. Defendant also objected to the double hearsay of Senter's statement that Defendant had a key to Ms. Harris' house.

Subsequent to arguments by counsel for both parties, the trial court made the following findings:

> The Court does make findings that the statement is offered as evidence of a material fact, and the statement is more probative on performance offered, for which it's offered, than any other evidence which the proponent can produce through reasonable efforts. And the general purposes of these rules of evidence in the interest of justice will be served by the admission of this statement.

> The Court does find that the statement was given under circumstances in which it is not only probative but has trustworthiness and has the—was given under circumstances under which it has the circumstantial guarantee of trustworthiness that would be required of an otherwise hearsay statement.

> So based upon these findings, the Court is going to deny the defendant's motion to suppress these statements and will allow the State to proceed forward with the asking of these questions and the giving of these answers.

We conclude the trial court made sufficient findings under *Triplett* to admit Ms. Harris' statements through Ms. Breeden, with the exception of Ms. Breeden's testimony that Ms. Harris told her that Senter said that Defendant made a duplicate key to her home. Because the trial court failed to make any findings as to Ms. Senter's

availability to testify and the reliability of her statements, we conclude the trial court erred in allowing Ms. Breeden to testify to those statements.

Notwithstanding, not every constitutional violation necessarily requires a new trial. N.C. Gen. Stat. § 15A-1443(b) (2005). Instead, where the State demonstrates that the constitutional violation was "harmless beyond a reasonable doubt," the error is deemed non-prejudicial, and reversal of a conviction is not required. *State v. Morgan*, 359 N.C. 131, 156, 604 S.E.2d 886, 901 (2004), *cert. denied* —— U.S. ——, 163 L. Ed. 2d 79 (2005). Our courts have previously concluded that "the presence of overwhelming evidence of guilt may render error of constitutional dimension harmless beyond a reasonable doubt." *State v. Autry*, 321 N.C. 392, 400, 364 S.E.2d 341, 346 (1988) (citation omitted); *State v. McKeithan*, 140 N.C. App. 422, 432, 537 S.E.2d 526, 533 (2000), *disc. review denied and appeal dismissed*, 353 N.C. 392, 547 S.E.2d 35 (2001). After reviewing the record in this case, we conclude that the trial court's error in admitting Ms. Breeden's testimony regarding the duplicate key does not necessitate reversal of Defendant's conviction. *See State v. Champion*, 171 N.C. App. 716, 723, 615 S.E.2d 366, 372 (2005).

**[13]** Defendant next contends the trial court erred in admitting Ms. Harris' statements to probation officer Arnold Foy. We disagree.

The trial court ruled:

COURT: All right. The Court is going to find that testimony by Arnold Foy will be allowed in regards to statements made by Ms. Harris to Arnold Foy, the substance of which appears in this notice of intent under Rule 804(b)(5), that appears of record, filed the 30th of March, 1998 by the prosecution giving notice to the defendant, through counsel of the intention to offer this evidence as an exception to the hearsay rule under the Evidence Rule 804, wherein the declarant is unavailable. The Court will find that this does, in fact, meet the exception of Rule 804(b)(5) and finds from what's proffered that the requirements of 804(b)(5) have been met and that the interest of justice would allow and require the admission of this evidence and will allow the admission of this evidence and will allow the witness to testify in regards to statements of Ms. Harris.

Because the trial court made sufficient findings under *Triplett* to admit the testimony of Officer Foy, we conclude the trial court did

not err in allowing Officer Foy to testify as to statements Ms. Harris made to him.

Similarly, with regard to the testimony of the various investigating officers to whom Ms. Harris complained about Defendant forging checks and fraudulently using her credit cards, the trial court ruled as follows:

> And in regards to each of the last witnesses who testified, [Officers] Grissom, Page, Rose, McDowell, O'Brien, and now Officer Calvin Smith, we will note that the Court has given the defendant a continuing objection to hearsay testimony. And from time to time, the defendant, through counsel has objected but the Court has noted objections to each of these witnesses' testimony in regards to anything said by Ms. Harris to these witnesses.

> The Court does find that there were notices of intention under Rule 804(b)(5) in regards to each of these witnesses. And the Court has overruled each of the objections of counsel on behalf of the defendant, to the testimony in regards to hearsay testimony by Ms. Harris to these witnesses.

We conclude the trial court made sufficient findings under *Triplett* and did not err in allowing the other investigating officers testify as to statements Ms. Harris told them.

[14] Finally, as it relates to the testimony of Carlos Breeden, Ed Hicks, and Barbara Royster, we conclude the trial court did not err in the admission of Ms. Harris' statements through these witnesses. Even if these statements were improperly admitted under Rule 804(b)(5), they were admissible under Rule 803(3), which allows a trial court to admit hearsay to show Ms. Harris' state of mind. *See State v. Burke*, 343 N.C. 129, 145, 469 S.E.2d 901, 908 (1996) (hearsay statements that the victim had been threatened by defendant showed victim's state of mind and relationship with the defendant); *State v. Jones*, 337 N.C. 198, 209, 446 S.E.2d 32, 38 (1994) ("evidence tending to show the state of mind of the victim is admissible as long as the declarant's state of mind is relevant[.]" (citation omitted)). Accordingly, all of Defendant's assignments of error relating to the trial court's admission of inadmissible hearsay are without merit.

[15] In his next assignment of error, Defendant argues that the State's improper guilt-phase closing arguments suggesting that he had attempted to sexually assault Ms. Harris' dead or dying body rendered

his trial unfair and unreliable in violation of due process, requiring a new trial under *State v. Sanderson*, 336 N.C. 1, 442 S.E.2d 33 (1994). We disagree.

"In both the guilt-innocence and the sentencing phases of a capital trial, counsel is permitted wide latitude in his argument to the jury. He may argue the facts in evidence and all reasonable inferences therefrom as well as the relevant law." *Id.* at 15, 442 S.E.2d at 42 (citations omitted). Counsel's argument is proper where counsel argues the law, the facts in evidence, and all reasonable inferences to be drawn therefrom. *State v. Shank*, 327 N.C. 405, 407, 394 S.E.2d 811, 813 (1990). Moreover, where a defendant fails to object to the closing argument by the prosecutor, our Supreme Court has held that the trial court is required to intervene *ex mero motu* only if the remarks are grossly improper. *State v. Hill*, 311 N.C. 465, 472, 319 S.E.2d 163, 168 (1984).

In this case, the prosecutor argued in closing that Defendant's hair on Ms. Harris' bedding, including a pubic hair on a bedcover "right near her pubic area," showed a sex attempt at the time of death. However, testimony had already been presented to the jury to show that a rape kit was performed on Ms. Harris and the results were negative for any kind of semen or recent sexual activity. We therefore conclude that the prosecutor's closing arguments were not so inflammatory as to require the trial court to intervene *ex mero motu*. *See Hill*, 311 N.C. at 472, 319 S.E.2d at 168. Thus, Defendant's assignment of error is without merit.

**[16]** In his next assignment of error, Defendant contends that the prosecutor misrepresented to the jury in his closing argument that Defendant's hair was deposited at the time of Ms. Harris' death, that Defendant was there when she died, and that the pubic hair was "near Ms. Harris' pubic area[.]" Defendant argues that because the trial court ruled that the hair samples did not prove that Defendant was present when Ms. Harris died and Defendant's pubic hair was found on bedding found behind Ms. Harris' body, not near her pubic area, the prosecutor's statements were unfairly prejudicial and entitle him to a new trial. A review of the record reveals that before the prosecutor's alleged misrepresentations about the significance of Defendant's hairs, Special Agent Gregory had testified that it could not be determined when Defendant's hairs were deposited on the bed. Furthermore, there were several instances at trial where the jury was informed exactly where Defendant's pubic hairs were found as it relates to Ms. Harris' body. Thus, we conclude there was no prejudi-

cial error as a result of the prosecutor misrepresenting the signifi-
cance of the hair evidence, and the exact location of Defendant's
pubic hairs on the bed where Ms. Harris' body was discovered. *See*
N.C. Gen. Stat. § 15A-1443(a) (2005) (providing that in order to
demonstrate prejudicial error, a defendant must show that there is a
reasonable possibility a different result would have been reached had
the error not occurred); *State v. Rosier,* 322 N.C. 826, 829, 370 S.E.2d
359, 361 (1988) (no prejudicial error where the prosecutor argued the
defendant's expert was paid to testify when there was no evidence
that the expert had been paid anything).

**[17]** Similarly, we reject Defendant's argument that the State imper-
missibly injected opinion and name-calling into the closing argument,
stating that Dr. Harris' opinion "actually cracks me up," and describ-
ing his expert testimony as being "from another planet." While the
prosecutor's comments challenged the limits of the wide latitude per-
mitted for argument, we do not find that this attempt to distinguish
the State's expert testimony from Defendant's expert testimony pro-
hibitively exceeded the bounds of permissible argument.

Moreover, the prosecution's characterization of the State's
witnesses, specifically Ms. Harris' family, as "credible, decent wit-
nesses" from "one of the finest families . . . in Durham . . . the most
attentive . . . faithful . . . nicest, cleanest cut people you ever would
want to meet" was not so improper as to require *ex mero motu* inter-
vention by the trial court. *See State v. Peterson,* 350 N.C. 518, 531-32,
516 S.E.2d 131, 139-40 (1999) (prosecutor argued victim was "a fine
woman. She was a beautiful women[,]" held not to require interven-
tion by trial court). Accordingly, Defendant's assignments of error are
without merit.

**[18]** Defendant next argues that he is entitled to a new trial be-
cause the prosecutors misrepresented that he possessed a key to Ms.
Harris' house, whereas the only keys in evidence that had any con-
nection with him (the keys found in Ms. Harris' car in New Orleans)
did not fit the lock on Ms. Harris' house. Contrary to Defendant's
assertion, a review of the record reveals that the State never argued
that any of the keys found in Ms. Harris' car fit the lock. Given that
the State presented evidence to show that there were no signs of
forced entry and that Defendant had entered Ms. Harris' house, the
prosecutors properly argued its theory that he used a duplicate key,
not necessarily any of the keys presented at trial, to gain entry into
her house. Defendant's assignment of error is therefore rejected.

**[19]** Defendant next contends the State misrepresented the facts of the case by arguing that defense counsel had the last opportunity to tamper with the keys obtained from Ms. Harris' car in New Orleans before trial. Specifically, Defendant argues that the certified photocopy of the exhibit shows that the lead investigator was the last person to have access to the keys, and the State's misrepresentation in the jury's presence prejudiced Defendant entitling him to a new trial.

However, a review of the trial transcript reveals that the prosecutor's arguments that defense counsel had the last opportunity to tamper with the keys in evidence were in response to defense counsel's assertion that the prosecution tampered with the same evidence. Defense counsel did not object to the prosecutor's argument, nor did he respond to the prosecutor's argument. Furthermore, Defendant fails to show how he was prejudiced as a result of these arguments. We therefore conclude that the arguments relating to alleged tampering with the evidence did not infect Defendant's trial with unfairness such that they rendered his conviction or sentence fundamentally unfair. Accordingly, the trial court did not abuse its discretion by failing to intervene *ex mero motu. See State v. Fleming*, 350 N.C. 109, 144-46, 512 S.E.2d, 720, 743-45 (1999).

**[20]** In his next argument, Defendant contends that the State illegally sequestered physical evidence in that there were originally three keys found in Ms. Harris' car (none of which fit her home), but then two keys "mysteriously" appeared at trial, one of which fit Ms. Harris' house. Defendant contends there was a break in the chain of custody as it relates to the keys found in Ms. Harris' car and that the trial court erred in denying Defendant's motion to disqualify counsel, motion to suppress the evidence, and motion to dismiss the charges against him since the State's theory relied on Defendant using a copy of a key to enter her home. We disagree.

Defendant filed a motion to disqualify the Office of the District Attorney as a result of the removal of evidence from the Property Room of the Durham Police Department to a locked closet in the prosecutor's office. Defendant argued that the prosecutor's removal of this evidence violated N.C. Gen. Stat. § 15-11.1(a) (2005), as well as his state and federal constitutional rights to due process of law and to confront the witnesses against him. The trial court held a hearing about the chain of custody of the evidence, and denied Defendant's motion to disqualify, concluding that the prosecutors' actions were not professional misconduct. Subsequently, our Supreme Court

denied Defendant's petitions for a temporary stay for a writ of certiorari, and for a writ of supersedeas seeking review of the trial court's decision.

At trial, Defendant renewed his motions to suppress the evidence, to dismiss the charges, and to set aside the verdicts based on the allegedly improper conduct of the prosecutors in sequestrating the evidence. The trial court denied Defendant's motions.

Defendant argues the trial court erred in denying his motion to disqualify counsel for improperly sequestering evidence for trial. This Court has held that absent a showing of an abuse of discretion, a decision regarding whether to disqualify counsel "is discretionary with the trial judge and is not generally reviewable on appeal." *In re Lee*, 85 N.C. App. 302, 310, 354 S.E.2d 759, 764-65, *disc. review denied*, 320 N.C. 513, 358 S.E.2d 520 (1987). As Defendant has not shown any abuse of the trial court's discretion in denying his motion to disqualify counsel, and we can discern no such abuse, Defendant's assignment of error is rejected.

[21] Likewise, we reject Defendant's argument that the trial court erred in denying his motion to suppress the evidence of the keys. "The standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting." *State v. Smith*, 160 N.C. App. 107, 114, 584 S.E.2d 830, 835 (2003) (internal quotation and citation omitted). If the trial court's conclusions of law are supported by its factual findings, we will not disturb those conclusions on appeal. *State v. Logner*, 148 N.C. App. 135, 138, 557 S.E.2d 191, 193-94 (2001).

In this case, the trial court found there was no evidence of prosecutorial misconduct regarding the handling of the items of evidence and no evidence that any item of evidence had been improperly or inappropriately tampered with or changed in any way. The trial court further found that Defendant, through his counsel, had been afforded access to the items of evidence upon request, and the Durham Police Department, through Officer Joe Williams and other technicians, had been available to accompany counsel to the prosecutor's office "at times in which the items [were] examined by [the] parties in preparation for this trial." After careful review of the record, we conclude there is competent evidence to support the trial court's findings of fact and they are therefore binding on appeal. We also hold that the trial court's findings of fact support its conclusion of law that "there

was no violation of any substantive or procedural due process of law or any other constitutional violations of law in regards to any rights or privileges of the defendant." Thus, Defendant's assignment of error is rejected.

Because we hold the trial court did not err in concluding there was no prosecutorial misconduct in the prosecution's handling of evidence, we need not address Defendant's related argument that the trial court erroneously denied Defendant's motion to dismiss based on these same grounds.

[22] In his next assignment of error, Defendant argues the trial court erred in denying his motion for a mistrial based on improper jury discussions. Defendant's argument is without merit.

The decision to grant a mistrial on the ground of juror misconduct rests largely within the discretion of the trial court, and its decision will not be disturbed unless there is a clear showing that the court abused its discretion. *State v. Perkins*, 345 N.C. 254, 277, 481 S.E.2d 25, 34 (1997) (citation omitted).

Upon Defendant's motion for a mistrial, the trial court held a hearing in which defense counsel's legal assistant testified that she overheard two jurors discussing the case outside the courtroom. Particularly, as she approached the two jurors, one said, "I believe that he is . . .," and then stopped talking as she approached. Defendant also submitted affidavits and eyewitness accounts of Juror #1 laughing and talking with Ms. Breeden, Ms. Harris' sister, and another family member. The trial court called Ms. Breeden to testify and she denied having any conversation with any jurors other than "good morning," etc. The trial court found that there was no substantial or irreparable prejudice to Defendant's case and denied Defendant's motion. As we can discern no abuse of discretion, we uphold the trial court's denial of Defendant's motion for a mistrial.

[23] We now review the trial court's order resolving the issues raised by Defendant in his motion for appropriate relief. We preliminarily note that Defendant does not challenge the trial court's conclusion that Defendant received ineffective assistance of counsel during the 1998 sentencing proceeding. Accordingly, the issues before this Court are: (1) whether the State misrepresented the evidence to minimize the life-threatening nature of Ms. Harris' medical condition in the months before her death; and (2) whether Defendant's trial counsel rendered ineffective assistance of counsel during the guilt/innocence phase of Defendant's 1998 trial.

The trial court's findings of fact in a hearing on a motion for appropriate relief are "binding upon the [defendant] if they were supported by evidence." *State v. Stevens,* 305 N.C. 712, 719-20, 291 S.E.2d 585, 591 (1982) (citations omitted). Our inquiry is limited to determining "whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *Id.*

Defendant contends the trial court erred in determining that he is not entitled to a new trial due to the prosecutors making material misrepresentations of fact about and withholding exculpatory evidence relating to Ms. Harris' true state of health at trial. Defendant cites to the prosecutor's opening statement which conceded that Ms. Harris "was not in perfect health, but she was in good enough health to have gone to her business and be working regularly[;] . . . she was just worn out." In closing arguments, one of the prosecutors commented on Ms. Harris' "getting around pretty good for her age. She was getting around pretty good and able to keep up with all the activities she had. She was a very active and independent woman." Defendant also cites to Ms. Breeden's testimony in response to defense counsel's questions about Ms. Harris' health, stating Ms. Harris "had a heart problem," but that Ms. Harris was "able to get up and go because I have a heart problem, too, but it doesn't stop me."

"When a defendant shows that testimony was in fact false, material, and knowingly and intentionally used by the State to obtain his conviction, he is entitled to a new trial." *State v. Sanders,* 327 N.C. 319, 336, 395 S.E.2d 412, 423-24 (1990) (internal quotation and citation omitted). Perjured testimony is material "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.*

As it relates to the prosecution's withholding of evidence, in *Brady v. Maryland,* the United States Supreme Court held that the prosecution must disclose exculpatory evidence to the defense. *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215 (1963). However, *Brady* requires that the government disclose only evidence that is not available to the defense from other sources, either directly or through diligent investigation. *Barnes v. Thompson,* 58 F.3d 971, 975 n.4 (4th Cir. 1995) ("Brady requires that the government disclose only evidence that is not available to the defense from other sources, either directly or through diligent investigation." (citation omitted)).

The trial court found that defense counsel obtained Ms. Harris' medical records prior to trial, and that Mr. Aus made notes and "tabbed" certain pages of the medical records after reviewing them. The trial court's finding of fact twenty-four states in pertinent part:

24. . . . The copy received by Mr. Aus was introduced at the evidentiary hearing, and he identified it by a number of "Post-it greenish tabs" that were affixed to a number of pages. . . . [Mr. Aus] would place the tabs on the pages after reviewing the records . . . The tabbed pages 'were areas that [Mr. Aus] noted of interest that might be of some potential value in the defense of [Defendant]'s case' . . . Mr. Aus was looking for information concerning Ms. Harris' 'bad heart,' psychological or mental health issues, or anything that could explain Ms. Harris' death 'other than homicide.' . . . Mr. Aus placed tabs on various pages of Ms. Harris' medical records, noting 'depression' five times, 'anxiety', 'hypertension', heart attack on September 16, 1987, 'currently on disability', '100% medical disability since 1990 for coronary artery disease', and that Ms. Harris was being seen by a psychiatrist[.]

The record reveals that Mr. Aus testified that he obtained and reviewed Ms. Harris' medical records from Duke University Medical Center on or about 23 March 1998. Mr. Aus said that after receiving, reviewing, and tabbing the medical records, he did not seek to have the records reviewed by a cardiologist or other heart specialist. However, on or about 3 April 1998, Mr. Aus delivered Ms. Harris' medical records to Dr. James Hilkey, a psychologist, "for the purpose of seeing if a psychological autopsy could be conducted based on [the] medical records." Mr. Aus testified that once Dr. Hilkey informed him that the psychological autopsy of Ms. Harris was a "dead end," Mr. Aus "forgot about the existence of those records" until after the trial.

After careful review of the record, we conclude there is competent evidence to support the trial court's findings of fact. Based on these findings of fact, the trial court concluded:

48. . . . there is no violation of due process resulting from prosecutorial non-disclosure of or failure to correct allegedly false testimony if defense counsel is aware of it and fails to object to or cross-examine the witness concerning the alleged false or misleading testimony.

Here, Mr. Aus testified that he had access to the same evidence as the prosecution (Ms. Harris' medical records), but failed to use this

information to correct the alleged misrepresentations made by prosecuting witnesses and by the prosecutor. Defendant cannot now assign error to the testimony. *See Barnes*, 58 F.3d at 976, n.4. Because we conclude the trial court's findings of fact are supported by competent evidence in the record, and the trial court's findings of fact support its conclusion of law, we find no error. Thus, Defendant's assignment of error is rejected.

**[24]** Defendant next contends the trial court erred in denying his request for a new trial due to Ms. Breeden's misrepresentations at trial about Ms. Harris' disability status. Specifically, Defendant argues that Ms. Breeden's testimony that Ms. Harris was on short-term disability, never revealing the Social Security order ruling Ms. Harris completely disabled from 1990 until her death, was a material misrepresentation by the prosecution entitling Defendant to a new trial.

The trial judge made the following finding of fact related to Ms. Breeden's testimony at the evidentiary hearing and at trial regarding Ms. Harris' social security disability benefits:

> 46. . . . At the evidentiary hearing, Mrs. Breeden testified, and the Social Security records themselves show that Ms. Harris' Social Security disability benefits were only approved posthumously in 1997, after Ms. Harris had been murdered. . . . Mrs. Breeden considered such Social Security disability benefits as long-term disability benefits, . . . and this Court has specifically found as fact that Mrs. Breeden was not trying to conceal the fact that Ms. Harris' estate was, at the time of the trial, receiving Social Security disability benefits. . . . Therefore, her testimony was not intentionally misleading. Ms. Harris' Durham City School records show that Ms. Harris, in fact, received state short-term disability payments from March 16, 1990 until February 28, 1991, and that on April 9, 1991 Ms. Harris was approved for state long-term disability payments. . . . Ms. Harris' state long-term disability benefits ended on May 31, 1996 . . . These long-term state disability benefits are apparently what Mrs. Breeden was referring to in her trial testimony. More importantly, Mrs. Breeden was never asked the question directly whether Ms. Harris' estate eventually had been posthumously awarded the Social Security disability benefits.

The record reveals that Ms. Breeden testified at the evidentiary hearing that she "[didn't] know the difference between short-term and long-term [disability benefits]". She further testified that it was her

understanding that Ms. Harris was repeatedly denied for social security benefits while she was alive, and that she was not approved for social security benefits until after her death, which Ms. Breeden considered death long-term benefits. We conclude there is competent evidence in the record to support the trial court's findings of fact.

Based on these findings of fact, the trial concluded:

46. . . . the mere fact Mrs. Breeden indicated that her sister was on 'short term disability' and did not volunteer that Ms. Harris['] estate was receiving Social Security disability benefits was not material, was not so misleading as to rise to the level of a state or federal due process violation, and could not have affected the jury's judgment.

Here, we cannot conclude that Ms. Breeden's testimony about Ms. Harris' social security benefits was a material misrepresentation that "could have affected the judgment of the jury." *Sanders*, 327 N.C. at 336, 395 S.E.2d at 424. Because we conclude the trial court's findings of fact are supported by competent evidence in the record, and the trial court's findings of fact support its conclusion of law, we find no error. Accordingly, Defendant's assignment of error is overruled.

[25] In his final argument on appeal, Defendant contends that the trial court erred in denying his request for a new trial based on ineffective assistance of counsel which violated his constitutional rights. Specifically, Defendant argues that his trial attorneys failed to present evidence about the time of Ms. Harris' death and Ms. Harris' lifestyle and associates; failed to object to or correct prosecutorial misrepresentations about Ms. Harris' health and other evidence; failed to present Kim Senter's report that Ms. Harris' hospitalization resulted from a suicide attempt by failing to take medication; and, failed to exhaust peremptory challenges. Defendant contends that his trial counsel's performance was objectively unreasonable under *Strickland v. Washington.*

The United States Supreme Court outlined a two-part test in *Strickland v. Washington,* 466 U.S. 668, 80 L. Ed. 2d 674 (1984), to determine if an ineffective assistance of counsel claim has merit. The Supreme Court of North Carolina adopted the *Strickland* test in *State v. Braswell,* 312 N.C. 553, 324 S.E.2d 241 (1985). In *Braswell,* our Supreme Court held that the defendant must first establish that his counsel's performance was deficient in that it fell below an "objective standard of reasonableness." *Id.* at 561-62, 324 S.E.2d at 248. Second, the defendant must show that a reasonable probability exists that

but for the error, the result of defendant's trial would have been different. *Id.* at 563, 324 S.E.2d at 248. Further, "if a reviewing court can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different, then the court need not determine whether counsel's performance was actually deficient." *Id.* at 563, 324 S.E.2d 249.

The trial court made the following findings of fact relating to whether Defendant was entitled to a new trial based on his trial counsel's alleged ineffective representation during the guilt/innocence phase of his trial:

> 54. . . . this Court has found from the evidence presented at the evidentiary hearing that Ms. Harris' medical records were reviewed by Mr. Aus, who even attached tabs and wrote notes thereon, highlighting Ms. Harris' documented depression, anxiety, hypertension, and disability, among other things. Therefore, Mr. Aus did more than just request and obtain the medical records; he reviewed them for content. Mr. Aus also gave the records to Dr. Hilkey on or about April 3, 1998 for the specific purpose of developing a possible suicidal theory of defense. Mr. Aus and Mrs. [sic] Castle interviewed both Dr. Thompson and Dr. Rudner about the possibility of the suicide theory and the sexual asphyxiation theory. The evidence before this Court, though minimal in many regards, shows a reasonably sufficient investigation by Mr. Aus and Mr. Castle for the guilt phase of the trial.
>
> ***
>
> 55. . . . the defense strategy clearly was to attempt to create reasonable doubt about the cause of Ms. Harris' death by suggestion that [she] died either: (1) naturally, as a result of a cocaine-induced heart attack while engaged in some unspecified sexual activity; or (2) accidentally, by sexual asphyxiation from the plastic bag wrapped around her head . . . . Under these circumstances, the medical records showing Ms. Harris' history of anxiety and depression would not likely have bolstered the defense, at least to any significant degree. The severity of Ms. Harris' heart condition was substantially before the jury.

(Emphasis omitted).

A review of the record reveals that defense counsel obtained and thoroughly reviewed Ms. Harris' medical records. Mr. Aus testified at

the evidentiary hearing that he first interviewed Dr. Thompson, the forensic pathologist who supervised the autopsy of Ms. Harris, in June 1997, and asked Dr. Thompson about the possibility of Ms. Harris' death being suicide. When asked why he asked Dr. Thompson about the possibility of suicide, Mr. Aus testified, "I was looking for any reason that it was not a homicide . . . . As a matter of fact, by that point, one of the things that came to my attention was the manner in which her body was found. And I was thinking along the lines of auto-erotic asphyxiation at that time, based on the position of the body and what I understood the crime scene to show."

Mr. Aus also testified that he recalled Mr. Castle, his co-counsel, asking Dr. Thompson about Ms. Harris' heart condition and its possible effect on the case. Mr. Castle testified that the defense team was interested in the toxicology report showing signs of cocaine in Ms. Harris' body and sexual asphyxiation because "approaching our theory of a possible accidental death, someone with a heart problem or a coronary problem already, who was regularly using cocaine, there would be a greater risk of a cocaine-induced coronary attack. And if you coupled that with asphyxiation of any type, whether it be sexual, or self-applied, or by someone else, it would increase the chances of a coronary occurring." After raising the sexual asphyxiation theory with Dr. Thompson, Mr. Castle testified that Dr. Thompson "insisted . . . that [Ms. Harris'] death was homicide," and Dr. Thompson was no longer cooperative, except that he suggested that their best strategy in representing Defendant was to focus on the time of Ms. Harris' death and to show that Defendant was no longer in North Carolina at that time.

After careful review of the record, we conclude that there is competent evidence to support the trial court's findings of fact. We now determine whether the trial court's findings of fact support its conclusion of law.

The trial court made the following conclusion of law relating to Defendant's claim of ineffective assistance of counsel at the guilt/innocence phase of his trial:

> 56. Therefore, on the face of the current record and the evidence presented at the evidentiary hearing, this Court concludes that, even if his trial attorney's inactions were objectively unreasonable, [Defendant] was not prejudiced concerning the medical records or other alleged failures, and [Defendant] is not entitled

to relief under *Strickland* and *Braswell*, as to the jury verdict in the guilt/innocence phase of the trial.

(Emphasis omitted).

We conclude the trial court did not err in concluding that, even if trial counsel's actions were objectively unreasonable, Defendant was not prejudiced concerning the defense counsel's use or non-use of Ms. Harris' medical records or any other alleged failures. Trial counsel's decision to pursue a theory of sexual asphyxiation or accident instead of suicide is a defense strategy that cannot be second-guessed on appeal. *See State v. Prevatte*, 356 N.C. 178, 236, 570 S.E.2d 440, 472 (2002) ("decisions concerning which defenses to pursue are matters of trial strategy and are not generally second-guessed by this Court."). Because we find that the trial court's findings of fact are clearly supported by competent evidence of record, and those findings of fact adequately support the trial court's conclusion of law, we find no error. Accordingly, Defendant's assignment of error is overruled.

In sum, we hold that Defendant received a trial free of prejudicial error, except that we vacate Defendant's convictions for possession of the automobile and the credit cards. We also affirm the trial court's order denying Defendant a new trial based on prosecutorial misconduct and ineffective assistance of counsel.

No Prejudicial Error, Vacated in part.

Judges STEELMAN and JOHN concur.